UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SEAN REID,

                       Petitioner,

    -vs-

MICHAEL GIAMBRUNO, Superintendent,
Wyoming Correctional Facility,

                    Respondent.
_____

**DECISION AND ORDER**
No. 03-CV-0250(VEB)

## I.    Introduction

Sean Reid ("Reid" or "petitioner"), proceeding *pro se*, seeks a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 challenging his conviction in Erie County Court on one count of

first degree rape and one count of first degree sexual abuse. The parties have consented to

disposition of this matter by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

## II.    Factual Background and Procedural History

Reid was indicted on one count of first degree rape, one count of first degree sodomy, and

one count of sexual abuse based on his allegedly forcing his ex-girlfriend Barbara Bolden

("Bolden" or "the victim") to engage in sexual contact with him on February 3, 1997. The

defense theory of the case was the sexual activity that occurred between Reid and Bolden was

consensual, and that Bolden had fabricated the charges of sexual assault in an attempt to punish

Reid for becoming engaged to be married to another woman. Trial counsel, in his opening

statement, stated that Reid and Bolden had an on-again, off-again relationship for about five

years, and that "the constant thread through th[e] entire relationship was sex;" "[t]hey enjoyed

each other." R.86.[1] Trial counsel argued to the jury to "look at what type of sexual relationship"

Reid and the victim "had over the years and whether it's calm, soft and loving or more rough and

tumble enjoyment." R.87. Trial counsel conceded that there was sex but argued that even the fact

that the prosecution was based on "forcible compulsion" did not establish that there was rape

because Reid's consensual sexual practices with Bolden had an element of forcefulness. *See*

R.86-87.

On the afternoon of Sunday, February 2, 1997, Reid called and said that he "wanted to

come see [their son]." R.96. Bolden explained that she was not dressed and asked for about an

hour before he came over, Reid "got upset" and said that "he can see that I am still on that shit,"

"[m]eaning that he couldn't just stop in to see Chris whenever he felt like it." R.97. Reid called

back and apologized and said that he "really needed to see" their son. R.97. Bolden said they

"still weren't dressed" and Reid said "forget it." R.97. Reid did not come over at all that day.

On Monday, February 3, 1997, Bolden had a qualification interview and test with the

Private Industry Counsel at 11:30 a.m. R.97. Bolden testified that she had gotten her hair done

the previous day and was aware that there was a dress code for the interview. R.100. After

getting her two older children out to catch the school bus, she had planned to leave Christopher

---

[1]        Citations to "R.___" refer to the Record on Appeal.

with her cousin, Monica Green ("Green") while she when to the interview. R.99. However,

Bolden's son missed his bus and she was forced to put on a sweatsuit over her pajamas and drive

him to school, returning home at about 9:50 a.m. R.101-02.

Bolden testified that as soon as she entered her home, the telephone rang; it was Reid, and

he wanted to come by to see the baby. R.103. Bolden said that she "had something to do and he

would have to do it later." R.103. According to Bolden, Reid responded the same way he had the

following day; he hung up and said that he would call back. R.103. Shortly thereafter, Reid called

back on his cellphone and said, "Open the door. I am here." R.104. Bolden allowed Reid to come

in; he started taking his coat off and she handed the baby to him. R.105. Bolden testified that

Reid asked her for a kiss but she declined. R.106. Bolden then went into her dining room; she

could hear Reid talking to the baby.

Reid came into the dining room and asked her for a "kiss again and a hug at least." R.108.

Bolden recalled that Reid "came closer to" her but did not touch her. She told him "to step back

and that, no, he could not have a kiss." R.108.

Bolden related that Reid then walked into her bedroom and began "pulling things off the

dresser and looking at pieces of paper and tearing them up." R.110. The pieces of paper had

"little notes" to herself and phone numbers." R.110. Reid said "he couldn't believe that [she] was

giving away his stuff," which she interpreted him to mean giving herself away, "[l]ike [she]

belonged to him." R.110-11. According to Bolden, Reid's mood had changed from "calm, glad to

see [his son]" to "[i]rritated." R.111. Bolden then informed Reid several times that he "had to

go." R.112.

Bolden testified that Reid "kept asking for a kiss," which she refused to give him, and

tried to hug her. R.112. According to Bolden, Reid "said he wanted to kiss [her] pussy" and but she said no. R.113. During this time, Reid had her in a "bear hug" and was kissing her. R.113. Reid weighed about 190 pounds; she weighed about 145 pounds.

Bolden recalled that when she bent her knees in an attempt to get out from under him, Reid's weight came down on top of her and they ended up on the bed. R.115. Reid started kissing her neck and sucking on her chest, and telling her that he knew she "wanted it." R.116-17. Reid testified that she was "[c]onstantly telling him to get off" of her. R.116. Reid then twisted her arm, which forced her onto her stomach; she "could feel his penis on [her] backside," namely, in her anal area. R.117-18. At that point, her pants were down. *Id.* Bolden, feeling pressure by his penis, told Reid, "please don't." R.119. Reid again said that he "wanted to lick [her] pussy" and Bolden refused. R.119.

Eventually, Bolden struggled away off the bed and backed up to the wall, trying to stand up. R.120. Reid pulled her back and she ended up on the floor. Bolden testified that Reid was trying to get his head between her legs, so she crossed her legs and "[h]ollered at him" to get away from her to no avail. R.121. Reid put her legs up in the air and she could feel his penis penetrate her vagina. R.122. Bolden testified that it felt "rough" and that it hurt. R.122. Bolden told Reid to stop, but Reid said that he wanted her to "give it to him" and "cooperate." R.123.

After he ejaculated, Reid removed his penis from Bolden's vagina, stood up, fixed his pants, and started throwing money on the bed "for [her] to get [her] hair fixed[.]" R.123. Reid then left her house. Bolden testified that he was upset and crying and had pain in her vaginal area. Soon after, she testified, Reid called and said that he "couldn't believe she didn't want it." R.125.

Bolden took her son to her stepfather's house so he could babysit after she was unable to reach her cousin, who originally was going to babysit for her. R.127. Bolden testified that she went late to her interview and test, even though she was dressed inappropriately in her sweatsuit. R.129-30. Salina Mayes ("Mayes"), a colleague of hers at the Private Industry Counsel, testified that she noticed that Bolden's face was red as if she had been crying. R.262. When Mayes asked what was wrong, Bolden told her that Reid "had forced himself" on her. R.262, see also R.131.

Bolden testified that she did not attempt to report what had happened because she "had no faith in the system" and felt like she and her family "could handle it." R.131. The next day, she went to the hospital because she was still having pain in her vaginal area. R.132. Bolden testified that she never had felt pain like that from previous sexual encounters with Reid. R.132. Hospital personnel subsequently contacted the police regarding her situation. R.132-33. Bolden identified photographs of bruises on her chest as marks resulting from Reid "sucking on her." R.134-36.

On cross-examination, defense counsel elicited from Bolden that over the course of her relationship with Reid, they had sexual intercourse "probably hundreds of times"; she acknowledged that he was the father of her child. Bolden admitted that there were times when Reid would give her a "hickey" or "passion marks" on parts of her body. R.290-91.  When asked if Reid in the past had been "forceful in his penetration" of Bolden, she said yes, but stated that it was "[n]ot to the point where [she] would have been hurt." R.291. Bolden admitted that she was "sexually aggressive in the bed" with Reid and that they would "get caught up in [their[ passions." R.302-03. Bolden stated that "[t]hat was part of part of [their] relationship." R.303.

Bolden testified on cross-examination that on "numerous" occasions, she and Reid broke up and later reunited. R.292. At one time, Bolden stated, Reid gave her an engagement ring and

she anticipated that they were going to get married. R.292. They soon broke up but got back

together; Bolden was still hoping that the two of them would get married. R.293. Bolden testified

to about two more break-ups following the engagement; the final break-up occurred in July 1996,

when Reid "had disappeared for a day and [they] just broke up." R.294. Bolden admitted that the

"last straw" came when she found out that he had continued to date another woman, whom he

ultimately ended up marrying. R.294. Bolden conceded that she knew about the other

relationship but stated that Reid had told her that "it was over." R.294. When they broke up in

July 1996, Bolden admitted that she had an altercation with this woman, who had accompanied

Reid to Bolden's house when Reid went to pick up his belongings. R.296.

Defense counsel attempted to have Bolden admit that on the day of the incident, she was

not going to let Reid "have his way" to come over to see his son, even if she were available.

R.304. Defense counsel asked Bolden whether, after she had sex with Reid on February 3, 1997,

she was left "absolutely desolated" because he did not want to get back together with her. R.306.

Bolden admitted that Reid left some money to buy something for herself and the baby but

contended that he "threw" it on the bed. R.306. Bolden denied that she was hoping that she and

Reid would get back together as a result of having sex on the day of the incident. R.306.

As a defense witness, counsel called Reid's aunt, Margaret Anne Edwards ("Edwards"),

who testified that she had known Bolden closely for about four or five years. R.315. On the night

of Reid's break-up with Bolden in July 1996, Bolden called her and said that Reid's new

girlfriend, Jodie Bell ("Bell") was coming over to her house and that she and the woman "were

going to get into a fight." R.316. At that time, Bolden was about eight months pregnant. When

Reid arrived to pick up his things from Bolden's house, Bell was in the car. R.317. Bolden

grabbed a baseball bat and headed toward the car. R.317. Edwards attempted to stop her, saying, "[Y]ou're going to hurt the baby." R.317. Bolden said that she "didn't care because he didn't want the baby anyway." R.317.  Edwards approached Bell who told her (Edwards) to "get out of [her] face." R.318. At that point, Edwards and Bell "got into a scuffle." R.318. The incident then ended and Reid and Bell left. R.318. The next day, Edwards testified, Bolden said that after she gave birth to the baby, "she was going to get back at [Reid] for bringing [his new girlfriend] to her house." R.319.

Timothy Clemons ("Clemons"), Bolden's step-father, testified that on the day of the incident, he babysat unexpectedly for Bolden's son. When Bolden arrived, Clemons testified, her hair was "messed up" and she appeared to have been crying. R.223. In response to Clemons' inquiry as to what was wrong, Bolden replied that Reid "took advantage of her." R.224. Clemons recounted that Reid later telephoned him and said, "I don't know what is going on, but I ain't [sic] no raper [sic]." R.225.

The prosecution called Dr. Joseph Valenti ("Dr. Valenti") to present medical testimony regarding his examination of Bolden in the emergency room. Dr. Valenti testified that Bolden presented as "sad and calm." R.149. He noticed an area of "bruising on the right shoulder" and "areas of bruising across the chest area." R.149. During the pelvic exam, Dr. Valenti observed "an area of excoriation or roughened, reddened area over the area between the vagina and anus." R.149. Dr. Valenti testified that, to a "reasonable degree of medical certainty," the excoriation he observed was "consistent with forced intercourse." R.150. The prosecutor asked Dr. Valenti if he had an opinion "within a reasonable degree of certainty as to what it would have felt like to" the victim "to have that happen to her[.]" R.150. Dr. Valenti testified, "I think it would have been

horribly, both physically and emotionally, traumatic." Defense counsel did not object to this testimony.  Dr. Valenti testified that the excoriation was "consistent with something rubbing that area over a period of time." R.151.

On cross-examination, Dr. Valenti admitted that he was aware of medical conditions in which individuals will "self-abuse" themselves and was aware of the condition of "people who become sexually sadomasochistic." R.152. Dr. Valenti acknowledged that "people who enjoy as part of their sexual activity [sic] pain being caused to them or by them" "could exist." R.152. Dr. Valenti acknowledged that when Bolden was examined at the hospital prior to his gynecological exam, her emotional condition was described as stable. R.153-54. He did not find any bruises on the victim's arms, even though there was an allegation that her arms had been restrained. R.154-55. Dr. Valenti acknowledged that the victim's clothing was neat and not disheveled. R.156. Dr. Valenti did not recall whether the victim had informed him about her blood disorder which caused her to bruise easily, and he admitted that a person would bruise more easily if they had a low platelet count. R.156-57. Dr. Valenti admitted that the bruises on the victim's chest area could be consistent with a "passion kiss or passion mark." R.158. Dr. Valenti testified that he did not find any bruising on the victim's buttocks area. R.160.

Petitioner Reid testified in his behalf that he had served in the Marines for four years and achieved the rank of Lance Corporal. R.330. At the time of trial, he was working full-time as a delivery person for Consolidated Deliveries and Logistics. R.330. He admitted to having one previous conviction for an unspecified felony. R.330.

Reid testified that he first started dating Bolden in August 1991 and that they resided together for a couple of years during that time. R.331. Reid stated that he and Bolden never had a

monogamous relationship, and that Bolden was aware that he saw other women. R.332. Reid testified that they broke up about five or six times during the course of their relationship because Bolden would become "very upset" that he also was dating other women and would "curse at [him]." R.332-33. When they would get back together, Reid would go visit her and they would have sex. R.333. Reid testified that even when they were not dating, Bolden continued to engage in sexual activity with him. R.333-34. Reid testified that he and Bolden had a "normal, healthy" and "passionate" sex life. R.334-35.

Reid related that they broke up in July 1996 when Bolden discovered that he was seeing Bell and engaged to be married to her. R.336. With regard to the incident in July 1996, when he went to get his belongings from Bolden's house following the break-up, Reid testified that Bolden grabbed a baseball bat and tried to "bust out the back window" of his car where his fiancee, Bell, was sitting. R.338. Reid testified that Edwards, his aunt, and Bell then "got into a confrontation." R.338.

Reid testified that from the time his son was born in August 1996 until the time of trial, he would see Bolden a couple of times a month at her house when he would go visit his son. R.339. Reid testified that they had sex every time he visited, and that it was no different from the sexual relations they had when they were dating. R.339-40. Reid testified that on the day of the alleged rape, he had stopped by while on a break from work to see his son. Reid said that he talked with Bolden for a while and then they "began to have foreplay and have sex." R.342. By foreplay, Reid meant that he was "[k]issing her," and giving her "passion marks." R.342. Reid testified that Bolden removed her clothes during this time. R.342. Reid then got on top of Bolden, and she put her legs on his shoulders, and they began having sexual intercourse. R.342.

Reid testified that he "was rubbing his penis between her vagina and her anus because that was a way of her getting off; that's how she liked it." R.343. Reid testified that he ejaculated inside Bolden's vagina. R.343.

He denied that he forced himself on her in any way and said that Bolden did not say anything to lead him to believe that she did not want to have sex. R.345. According to Reid, while they were having sex, Bolden said, "Give it to me." R.346. Reid testified that Bolden did not resist his overtures and responded positively to them. Reid testified that there was nothing different in the sexual activity he had with Bolden on that day as compared with any of the sex they had in the past. R.346.

After they had sex, Reid testified, he left Bolden's house. He later called her from his cell phone and told her that he did "not want to see [her] any more because he was "engaged and soon to be married." R.344. Bolden did not respond verbally but simply hung up the phone. R.344. About three days after he was charged, Reid called Bolden's step-mother and asked why Bolden was saying that Reid had raped her. R.345. Reid told the step-mother that he was not a rapist. R.345. Reid stated that he did not have any other conversations with members of Bolden's family.

The jury returned a verdict acquitting Reid of the sodomy charge but convicting him of first degree rape and first degree sexual abuse. Reid was sentenced as a second felony offender to concurrent determinate terms of imprisonment, the longest of which was ten years.

On direct appeal, Reid was represented by new counsel who argued that (1) the prosecution's medical witness was improperly permitted to testify that his physical findings following his examination of the victim were consistent with forced intercourse and that this was

reversible error because the testimony went to an ultimate issue in the case; (2) the prosecutor committed misconduct during his cross-examination of the defendant and on summation, thereby denying him his right to a fair trial; and (3) the verdict was against the weigh of the evidence. *See* Petitioner's Appellate Brief, Respondent's Exhibit ("Resp't Ex.") B.  The prosecution argued that the alleged error regarding the physician's testimony and the alleged errors committed by the prosecutor were unpreserved due to trial counsel's failure to object.

The Appellate Division unanimously affirmed Reid's conviction on March 21, 2001. *People v. Reid*, 281 A.D.2d 986, 722 N.Y.S.2d 848 (App. Div. 4th Dept. 2001). The Appellate Division agreed that all but one of the points of prosecutorial misconduct were unpreserved for review due to the lack of contemporaneous objection, and did not review them on the merits. As to the preserved instance of alleged impropriety, the Appellate Division did find that although the "prosecutor engaged in misconduct in seeking to impeach defendant by questioning him on cross-examination concerning his failure to support an out-of-wedlock child who was 'on welfare, that misconduct did not deny defendant a fair trial[.]" *Id.* (citations omitted).

The Appellate Division further found that Reid had not preserved for review his contentions with respect to the testimony of the examining physician, and did not review the merits of that claim. *Id.* (citations omitted). Finally, the Appellate Division held that the verdict was "not against the weight of the evidence," finding that "[t]he victim's testimony was not incredible as a matter of law, and the conflicting testimony raised issues of credibility for the jury to resolve[.]" *Id.* (citations omitted).

Appellate counsel wrote to Reid on April 4, 2001, informing him of the affirmance of his conviction. Appellate counsel wrote to him again on April 28, 2001, in response to

correspondence received from Reid and stated as follows:

> As I explained to you in my letter of April 4, 2001, because the decision of the Appellate Division was not [sic] unanimous, you do not have an absolute right to have the case reviewed by the Court of Appeals. I was retained to file and perfect the appeal to the Appellate Division, and do not believe that there is any possibility of the Court of Appeals granting leave to appeal in this matter. Consequently, I do not intend to file an application seeking that relief.

Letter dated April 28, 2001 from Mary Sullivan, Esq. to Petitioner, Respondent's Exhibit ("Resp't Ex.") D. Reid, acting *pro se*, thereafter sought a certificate for leave to appeal to the New York Court of Appeals. This was opposed by the prosecution on the basis that there were no questions of law warranting review by the Court of Appeals. *See* Letter from Erie County District Attorney dated June 26, 2001, Resp't Ex. D. The New York Court of Appeals denied leave to appeal denied on August 14, 2001.

Acting *pro se*, Reid filed a motion for a writ of error *coram nobis*, arguing that appellate counsel had been ineffective in failing to raise the following arguments on direct appeal: (1) trial counsel was ineffective in failing to retain a medical expert to testify for the defense; (2) trial counsel was ineffective in failing to object when the trial court allowed the prosecution's medical expert to testify as to the ultimate factual issue of forcible compulsion; and (3) trial counsel was ineffective in failing to preserve four instances of prosecutorial misconduct for appellate review by objecting to them. (The alleged instances of prosecutorial misconduct were those that appellate counsel had raised as stand-alone claims on direct appeal.)  Reid also argued that appellate counsel had been ineffective in not explicitly informing him that he could raise additional issues in a *pro se* supplemental brief.

Reid's *coram nobis* application arguing for reversal of his conviction based on appellate

counsel's alleged ineffective performance on appeal was opposed on the merits by the prosecution. The Appellate Division summarily denied the motion without a discussion of the merits. The prosecution also opposed Reid's application for leave to appeal, which was denied by the New York Court of Appeals on March 5, 2003.

This habeas petition followed in which Reid asserts as grounds for relief the same claims of ineffective assistance of appellate counsel he raised in his application for a writ of error *coram nobis*. Respondent concedes that all of his Reid's habeas claims are fully exhausted and has opposed Reid's claims of on the merits.

For the reasons set forth below, the Court denies Reid's petition.

**III.    Discussion of the Merits of Petitioner's Claims of Ineffective Assistance of Appellate Counsel**

**A.    Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which governs the disposition of Reid's habeas petition, a federal court may only grant a habeas petition based on a claim that was adjudicated on the merits in state court where such adjudication "resulted in a decision that . . . involved an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir. 2003).  In order to adjudicate a claim on the merits, the Appellate Division "need not mention the argument raised or cite relevant case law or even explain its reasoning process." *Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003) (internal quotation marks and citations omitted). The Second Circuit has held that even a one-word denial of a petitioner's claim is sufficient to constitute an "adjudication on the merits" for purposes of

AEDPA. *Sellan v. Kuhlman*, 261 F.3d 303, 312-13 (2d Cir. 2001). Thus, the Appellate

Division's one-word order stating that Reid's *coram nobis* petition was "[d]enied" represents an

adjudication on the merits for purposes of 28 U.S.C. § 2254(d). *See Mosby v. Senkowski*, 470

F.3d 515, 519 (2d Cir. 2006); *Jimenez v. Walker*, 458 F.3d 130, 141 (2d Cir. 2006).

### B.     Legal Principles Governing Ineffective Assistance Claims

Reid's ineffective assistance of appellate counsel claim "'necessarily invokes federal law

that has been "clearly established" by the Supreme Court within the meaning of AEDPA.'"

*Mosby v. Senkowski*, 470 F.3d at 519 (quoting *Sellan v. Kuhlman*, 261 F.3d at 309). As noted

above, although the Appellate Division's summary rejection of Reid's *coram nobis* application

did not mention his ineffective assistance claim as a federal claim, it nonetheless constituted an

adjudication on the merits. *Id.* (citing *Sellan*, 261 F.3d at 309, 312). Thus, this Court must apply

AEDPA's "'highly deferential standard'" in reviewing Reid's ineffective assistance of appellate

counsel claim. *Id.* (citing *Eze v. Senkowski*, 321 F.3d at 112).

The Supreme Court set forth the test for such claims in *Strickland v. Washington*, 466

U.S. 668 (1984). To establish ineffective assistance of counsel under *Strickland*, Reid must

demonstrate (1) that his counsel's performance was deficient, and (2) "that the deficient

performance prejudiced the defense." *Strickland*, 466 U.S. at 687. The first component "requires

showing that counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment." *Id.* The second requires "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Id.* at 694. A claim of ineffective assistance of appellate counsel is reviewed

using the same *Strickland* standard as is used in a claim of ineffective assistance of trial counsel.

*Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citing *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)), *cert. denied*, 508 U.S. 912 (1993)).  A petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and that absent counsel's deficient performance, there was a reasonable probability that defendant's appeal would have been successful. *Mayo,* 13 F.3d at 533-34; *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d Cir. 2001).

A defendant's appellate attorney need not raise every non-frivolous legal argument on appeal which the trial record supports. *See Evitts v. Lucey*, 469 U.S. 387 (1985); *Jones v. Barnes*, 463 U.S. 745 (1983); *Smith v. Robbins*, 528 U.S. at 285. To the contrary, the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith*, 477 U.S. at 536 (quoting *Jones v. Barnes*, 463 U.S. at 751-52). Assigned appellate defense counsel is not required to raise every non-frivolous issue on appeal as requested by a defendant. *See Jones*, 463 U.S. at 751 ("Neither *Anders* [*v. California*] nor any other decision of this Court suggests, however, that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points."); *see also*, *e.g.*, *People v. White*, 73 N.Y.2d 468, 541 N.Y.S.2d 749 (N.Y. 1989) ("[A]n attorney is not necessarily guilty of ineffective assistance for failing to argue issues the client requests, even if hindsight shows that one of these issues would have been meritorious on appeal.") (citing *Jones v. Barnes*, 463 U.S. at 751-52).

When challenging the effectiveness of appellate counsel, a petitioner must show that counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (citing *Mayo*, 13 F.3d at 533). A petitioner asserting constitutionally deficient performance must show more than counsel's failure to raise a non-frivolous argument, as counsel is required to use professional judgment when deciding to concentrate on a few key issues while eliminating weaker arguments. *Jones v. Barnes*, 463 U.S. at 751-52 (1983); *Sellan v. Kuhlman*, 261 F.3d at 317. "Strategic choices," such as deciding which issues to raise on appeal, "made after thorough investigation of the law and facts . . . are virtually unchallengeable." *Strickland*, 466 U.S. at 690-91. "[T]he decision of appellate counsel to raise a claim on appeal that may reasonably be considered stronger than those asserted by the petitioner in a habeas petition is usually a well-reasoned tactical decision [and] does not constitute ineffective assistance of counsel." *Wood v. Artuz*, 39 F. Supp.2d 217, 216 (E.D.N.Y. 1999) (citing *Jones v. Barnes*, 463 U.S. at 751-52; *Cantone v. Superintendent*, N.Y. Correctional Facility at Green Haven, 759 F.2d 207, 218-19 (2d Cir.1985)).

The Second Circuit in *Eze* explained that "the heavy burden of showing ineffective assistance" of counsel under *Strickland v. Washington* is "enhanced by the hurdle posed by the highly deferential review accorded state court adjudications under [AEDPA]." 321 F.3d at 112 (citations omitted)). Under § 2254(d)(1) of AEDPA, the Court's "inquiry is not whether the Appellate Division's rejection of [petitioner's] ineffective assistance claim was incorrect, but whether, in light of *Strickland*, it was 'objectively unreasonable.'" *Mosby*, 470 F.3d at 519 (citing *Sellan*, 261 F.3d at 315; *Williams v. Taylor*, 529 U.S. 362, 410 (2000) (O'Connor, J. for the Court, Pt. II) (stating that "an unreasonable application of federal law is different from an

incorrect application")). The Second Circuit has held that "[s]ome increment of incorrectness beyond error is required" for an application to be considered "objectively unreasonable," although "the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (quoting *Matter of Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks and citations omitted in original).

In connection with his *coram nobis* application, Reid attached a letter from appellate counsel written on February 25, 2001, before his direct appeal was argued before the Appellate Division. Appellate counsel therein explained the reasoning behind her strategic decision as to which issues to raise on appeal, stating that she had incorporated some of his suggestions into the brief but did not include others because she was "ethically bound not to make arguments on appeal" that she did not "reasonably believe" had merit. Letter dated April 28, 2001 from Mary Sullivan, Esq. to Petitioner, Resp't Ex. D. In particular, appellate counsel acknowledged that although trial counsel "did not preserve for appeal several of the points that [were] included in [the] brief," she "could not argue that his errors constituted ineffective assistance of counsel" because trial counsel "effectively cross-examined witnesses for the prosecution, offered evidence on [Reid's] behalf and made legal arguments by casting the proof in the light most favorable to [the defense]." *Id.* Appellate counsel opined that trial counsel's "representation of [Reid's] interests did not appear to [her] to be so poor as to meet the standard necessary to establish ineffective assistance of counsel."[2] *Id.*

---

[2]      The New York Court of Appeals has articulated the standard for measuring the performance of counsel under the New York Constitution as follows: "So long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided

-17-

Appellate counsel further indicated that although she had "maintained from the beginning that this case would be difficult to win on appeal," she "also believe[d] that the first and second arguments . . . [were] strong enough to warrant reversal of [his] conviction." As noted above, the first point appellate counsel raised on direct appeal was that the prosecution's medical witness was improperly permitted without objection to testify that his physical findings following his examination of the victim were consistent with forced intercourse and that this was reversible error because the testimony went to an ultimate issue in the case. The second argument was that the prosecutor committed misconduct during his cross-examination of the defendant and on summation, thereby denying him his right to a fair trial. Both of these claims had been found to be unpreserved due to trial counsel's failure to object. Appellate counsel acknowledged that trial counsel had failed to object to the testimony but argued that the Appellate Division "should reverse the defendant's conviction as a matter of discretion in the interest of justice, pursuant to Criminal Procedure Law Sections 470.15(3)(c) and 470.15(6)(a)." *Id.*[3] Reid's counsel articulated a strategic reason for not including the claims of ineffective assistance of trial counsel, which were not likely to succeed on direct appeal, as discussed more fully below. For the reasons that follow, the Court cannot find that the Appellate Division unreasonably applied the *Strickland* standard in rejecting Reid's *coram nobis* application and declining to find that appellate counsel rendered ineffective assistance.

---

meaningful representation, the constitutional requirement will have been met[.]" *People v. Baldi*, 54 N.Y.2d 137, 147 (N.Y. 1981); *see also People v. Satterfield*, 66 N.Y.2d 796 (N.Y. 1985); *People v. Ford*, 86 N.Y.2d 397, 405 (N.Y. 1995)). The phrase "meaningful representation" does not mean "perfect representation[.]" *People v. Modica*, 64 N.Y.2d 828, 829 (N.Y. 1985).

[3]     Under those sections, the Appellate Division has the authority to reach the merits of unpreserved claims.

C.    **Alleged Instances of Appellate Counsel's Ineffectiveness**

1.    **Failure to Argue that Trial Counsel Erred in Failing to Call a Medical Expert**

Reid contends that appellate counsel should have argued that "defense counsel should have secured the services of a medical expert to testify to the fact that the results of the physical examination conducted on the complainant did not exclusively demonstrate that she had been raped or sexually abused, and that the results could very well have been caused during normal, consensual sexual activity." Petitioner's Traverse ("Pet'r Trav.") at 3 (Docket No. 11).  As respondent points out, "'The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial.'" *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992) (quoting *United States v. Neresian*, 824 F.2d 1294, 1321 (2d Cir.), *cert. denied*, 484 U.S. 957 (1987)).  Errors by trial counsel related to decisions "fall[ing] squarely within the ambit of trial strategy . . . [provided that they are] reasonably made, will not constitute a basis for an ineffective assistance claim."  *United States v. Nersesian*, 824 F.2d at 1321. This principle holds true as a matter of New York state law, as well. *E.g.*, *People v. Hernandez*, 295 A.D.2d 989 (App. Div. 4th Dept. 2002), *lv. denied*, 98 N.Y.2d 711, *writ of error* coram nobis *denied*, 303 A.D.2d 1059, *lv. denied*, 100 N.Y.2d 562 ("Defense counsel's failure to call a witness at trial does not, by itself, constitute ineffective assistance of counsel. Viewing the evidence, the law, and the circumstances of this case, in totality, and as of the time of the representation, we conclude that defendant received effective assistance of counsel [.]"); *see also People v. Samuels*, 2006 WL 4050815, at *19 (N.Y. Sup. Ct. Dec. 21, 2006)) ("'The decision whether to call any witnesses on behalf of the

-19-

defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by

defense attorneys in almost every trial.'") (quoting *United States v. Smith*, 198 F.3d 377, 386 (2d

Cir.1999)).  Reid does not address this argument but contends that "in view of the extreme

closeness of the case," it was "constitutionally deficient" for trial counsel not to secure a medical

expert.

First, contrary to Reid's suggestion, the prosecution's expert witness did *not* testify that

the physical findings "exclusively" established that the victim had been "raped" or "sexually

abused."  Dr. Valenti's opinion was that, to a reasonable degree of medical certainty, the

gynecological findings of his examination of the victim were "consistent with" "forced

intercourse." R.150.  This testimony was not improper as a matter of New York state or Federal

evidentiary law, as discussed further below in this opinion in the context of Reid's claim that the

prosecution's medical expert was allegedly permitted to testify as to an ultimate factual issue.

More important, Reid has not provided support for his contention that defense counsel would

have been able to obtain a medical expert witness to refute or significantly undermine the

prosecution's expert's testimony, and New York courts have found that a defendant's speculation

as to how an expert witness would have testified "provides no basis to conclude that defendant

had less than competent legal counsel." *People v. Ahl*, 243 A.D.2d 985, 663 N.Y.S.2d 907 (App.

Div. 3d Dept. 1997) (attorney's failure to call psychiatric experts to refute prosecution's rebuttal

psychiatric witness on issue of extreme emotional disturbance was not shown to be ineffective

assistance of counsel in prosecution for attempted murder of estranged wife; even though various

medical and psychiatric professionals treated defendant after attack and medical records indicated

depression, long history of alcohol abuse, suicidal thoughts, and adjustment disorder, defendant

only speculated as to how the various professionals might have testified and as to how such possible testimony related to affirmative defense, and defendant failed to establish lack of explanation for attorney's decision).

In *People v. Hobot*, 200 A.D.2d 586, 606 N.Y.S.2d 277 (App. Div. 2d  Dept.1994), *aff'd* 84 N.Y.2d 1021, 1022 (N.Y. 1995), *habeas corpus denied sub nom. Hobot v. McGuiness,* No., 96-CV-4324 FB, 1998 WL 642705 (E.D.N.Y. Sept. 16, 1998), the defendant was tried and convicted for first-degree rape and first-degree sexual abuse of nine-year-old girl. Defendant Hobot argued that defense counsel had been ineffective in failing to familiarize himself with the report of a physician who had examined the rape victim and who had concluded that her hymen was intact; the prosecution's medical expert, an experienced gynecologist, testified at trial that he had examined the child and found tears in her hymen which were consistent with penetration by the penis of an adult male. Defendant Hobot argued that trial counsel should have called the other physician to testify or should have secured another expert witness to interpret her report, which he argued "diametrically opposed" the prosecution's medical evidence. *People v. Hobot*, 200 A.D.2d at 595. The Appellate Division agreed that trial counsel erred in failing to familiarize himself with those facts, but could not conclude that "the defendant was denied meaningful representation or was actually prejudiced thereby." *Id.* at 596. The court rejected "the defendant's assertion that trial counsel might have secured an expert witness to interpret and testify regarding [the other physician's] examination," finding that it was "entirely speculative." *Id.* The *Hobot* court found it significant that trial counsel competently cross-examined the prosecution's expert regarding his medical findings. He further argued in summation the point which defendant urged that a rebuttal medical expert should have been called as a witness to opine–*i.e.*, that the physical

condition of the complainant was inconsistent with the allegations that she had been penetrated repeatedly. The Court of Appeals affirmed, holding that "[u]nder any view of the record in this case, trial counsel's omission did not prejudice the defense or defendant's right to a fair trial" as "[d]efendant has made no showing that he was denied a fair trial because trial counsel failed to utilize the medical notes prepared by the general practitioner or call her as a witness." *People v. Hobot*, 84 N.Y.2d at 1024 (citations omitted).

As *People v. Ahl* and *People v. Hobot* demonstrate, it is difficult to obtain reversal of a New York conviction on appeal based on trial counsel's failure to call an expert witness, especially when the proposed expert testimony is only speculative. That case law, coupled with appellate counsel's letter to Reid explaining her strategy and reasons behind the issues she raised and omitted, leads this Court to conclude that there was not an "unreasonable application" of the performance prong of *Strickland. See Sellan*, 261 F.3d at 315 ("The *coram nobis* court knew that Sellan's [appellate] counsel carefully considered raising the [state law] issue, but ultimately decided the claim was not likely to succeed, perhaps because the direct appeal was before the Second Department, which had foreshadowed its approach to repugnancy claims in [an earlier decision]. The state court was also aware that appellate counsel raised other strong claims in her appellate brief and that in her professional judgment, at the time she filed her brief, the arguments she did raise were more likely to succeed than the . . . argument that she omitted.").

Reid points to *Pavel v. Hollins*, 261 F.3d 210, 223 (2d Cir. 2001), and its progeny, *e.g.*, *Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005), and notes that trial counsel's decision not to call a medical expert to testify in a child sexual abuse case where the physical findings could have been caused by circumstances other than sexual abuse was found to be deficient because it

was not based on pre-trial consultation with such an expert. Pet'r Trav. at 4 (Docket No. 11).

Reid's reliance upon these cases is, in this Court's opinion, inapposite.  For instance, in *Gersten*,

the state's case against petitioner "rested centrally on the alleged victim's testimony and its

corroboration by the indirect physical evidence as interpreted by the medical expert." 426 F.3d at

609. The medical expert testimony was so critical in *Gersten* because it "constituted the most

extensive corroboration that any crime occurred," and because "undermin[ing] it would

undermine the alleged victim's credibility and thus the entire prosecution case as to all charges."

*Id.* Essentially, a contrary report by a medical expert–that is, one that "failed to reveal any

evidence clinically indicative of sexual penetration"– would have "constitute[d] strong

affirmative evidence that forced sexual penetration did not occur–particularly forced sexual

penetration of the frequency alleged by [the victim]."  The Second Circuit in *Gersten* reiterated

that "medical expert consultation or testimony is particularly critical to an effective defense in

sexual abuse cases where direct evidence is limited to the victim's testimony." *Id.* (citing *Eze*,

321 F.3d at 128; *Pavel*, 261 F.3d at 224; *Lindstadt v. Keane*, 239 F.3d 191, 201 (2d Cir. 2001)).

Thus, "when a defendant is accused of sexually abusing a child and the evidence is such that the

case will turn on accepting one party's word over the other's, the need for defense counsel to, at a

minimum, consult with an expert to become educated about the 'vagaries of abuse indicia' is

critical." *Id.* (citing *Eze*, 321 F.3d at 128) (internal citations omitted in original). The Second

Circuit highlighted the fact that *Gersten* was not a case where there was "objective evidence . . .

implicating petitioner in [the] crime, such as bodily fluids identified as the petitioner's, or . . .

third party eyewitness testimony;" rather, the only direct evidence that any crime occurred was

the testimony of the alleged victim.  Therefore, the Second Circuit held, "for defense counsel to

simply concede the medical evidence without any investigation into whether it could be challenged was performance that the state court could not reasonably find to be objectively reasonable."

Unlike the petitioners in *Pavel* and its progeny, Reid was not charged with sexually abusing a child victim, and the medical evidence was not as crucial to the question of his guilt. Both the defense and the prosecution agreed that Reid and the victim had engaged in some sexual conduct. Thus, the primary issue in this case, in contrast with *Pavel*, *Eze* and *Gersten*, is not whether the alleged sexual conduct actually occurred, but whether it was consensual. Therefore, the medical evidence corroborating the sexual assault was less central to the jury's determination of guilt since it does not appear to be possible to distinguish with certainty between consensual and non-consensual intercourse based only on a review of the victim's medical records. *Accord*, *e.g.*, *Andrickson v. Brown*, No. 05 CV 4506 (ARR), 2007 WL 1704133, at *4 ( E.D.N.Y.  June 12, 2007) (finding that petitioner was not prejudiced by trial counsel's failure to call a medical expert witness in a rape case because he failed to demonstrate that there was a reasonable probability of a different result even had an expert testified that the medical findings were "consistent with" consensual intercourse). Of course, had trial counsel been able to elicit from the prosecution's medical expert witness an explicit admission that the physical examination was not conclusive as to whether the victim was subjected to forcible intercourse or whether the sex was consensual, it likely would have strengthened the defense case or at least weakened that prosecution expert's impact. *See Andrickson v. Brown*, 2007 WL 1704133, at *4.

In *Andrickson*, the prosecution's medical expert testified on direct examination that one could never conclude, based solely on a gynecological examination of the victim, that the

"person was sexually assaulted and raped." On cross-examination, petitioner's counsel elicited

testimony about the absence of evidence of injuries one might expect from the version of events

that the victim had described and, as the doctor "had testified on direct, she said the evidence was

consistent with rape, but also consistent with consensual sexual intercourse." *Id.* (citations

omitted). Andrickson's trial counsel elicited from the doctor that it was "impossible for the

examiner to make a determination [that] the injuries are from consensual versus non-consensual

intercourse." *Id.* (quotation marks omitted). Counsel in *Andrickson* concluded his

cross-examination by having the prosecutor's doctor "agree that after reviewing the medical

records she could not state with any medical certainty that [the victim]  had 'forcible

intercourse.'" *Id.* (quotation omitted). The state court rejected petitioner Andrickson's claim that

trial counsel was ineffective in failing to present his own expert because, like Reid, he "fail[ed]

to state what that expert would or could have testified to . . . [and] [u]nless the expert could state

that the injuries observed on the complainant were only consistent with consensual sex, the

defendant's medical expert could not do any better than defense counsel did on

cross-examination of the People's medical expert." *Andrickson*, 2007 WL 1704133, at *4

(quotation omitted). The district court decision that the state court's finding that "counsel had

provided adequate representation was neither contrary to, nor an unreasonable application of

*Strickland v. Washington*, 466 U.S. [at] 687 [ ], and so habeas relief [wa]s not warranted." *Id.* In

particular, the district court in *Andrickson* found, even assuming that counsel failed to consult

with an expert to educate himself about the incidence of trauma in rape cases or to explore the

possibility of presenting expert testimony, and that such an omission was unreasonable,

petitioner was not prejudiced because the issue was "consent and not whether the sexual conduct

even occurred[.]" Thus, the prosecution's medical evidence was "less central because, as the prosecution's expert testified, it [was] 'impossible' to distinguish between consensual and non-consensual sexual intercourse solely on review of the medical records." *Id.* (quotation omitted). Accordingly, since trial counsel had been able to elicit  testimony on cross-examination, the district court found, petitioner was not prejudiced by trial counsel's failure to call his own expert witness.

Here, in Reid's case, respondent argues that no prejudice ensued as a result of trial counsel's failure to call a rebuttal medical expert because the jury had before it testimony supporting a conclusion that the findings of the physical examination, namely, the bruises on her chest, could have been caused during normal consensual sex. Respondent's Memorandum of Law ("Resp't Mem.") at 5 (Docket No. 9). In addition, respondent argues, trial counsel was able to elicit from Dr. Valenti an acknowledgment that certain individuals enjoy having pain inflicted upon them as a part of sexual intercourse, R.152, and that he did not find any bruises on the victim's arms, even though there was an allegation that her arms had been restrained. R.154-55. In addition, Dr. Valenti acknowledged that the victim's clothing worn at the time of the assault was neat and not disheveled or torn or stretched, R.156, and trial counsel argued on summation that this showed "no signs of any resistance on the part of [the victim]." R.391. Trial counsel forced Dr. Valenti to admit on cross-examination that the bruises on the victim's chest area could be consistent with a "passion kiss or passion mark." R.158. The victim had testified that Reid normally would give her such "passion marks" during their consensual sexual relations. Furthermore, the victim had not informed Dr. Valenti him about her blood disorder which caused her to bruise easily, and Dr. Valenti admitted that a person would bruise more easily if they had a

low platelet count. R.156-57.  Dr. Valenti testified that he did not find any bruising on the

victim's buttocks area. R.160. Trial counsel also pointed to Reid's testimony about . . . and

argued on summation that any physical findings "was normal" and "[p]erhaps aggressive, but

normal sexual behavior between the two of them." R.392. Thus, trial counsel did utilize the

medical testimony and other evidence of the fairly long sexual history between petitioner and the

victim to argue that the physical findings were equally consistent with consensual sex. Unlike the

attorneys in, *e.g.*, *Eze v. Senkowski*, Reid's trial counsel did not concede the medical evidence

without *any* cross-examination of the prosecution's medical expert witness, as discussed above.

However, Reid's trial counsel did not cross-examine the prosecution's medical expert

regarding the medical observations made during the pelvic examination but instead focused on

the other physical findings (*e.g.*, that the bruises on the victim's chest were consistent with

"passion marks" and that she had no bruises on her arms even though she alleged she had been

restrained). Trial counsel's cross-examination was aimed at undermining the prosecution's

expert's conclusion that the medical evidence was consistent with forcible intercourse, and thus

was undertaken in furtherance of the defense theory of the case that the sexual contact was

consensual. An admission, such as the one trial counsel in *Andrickson* obtained on cross-

examination from the doctor who had examined the rape victim, would have more effectively

neutralized the prosecution's expert's impact on the case. Thus, with the benefit of hindsight, the

Court can say that it likely would have strengthened the defense case for defense counsel in

Reid's case to have questioned the prosecution's expert regarding the findings from the

gynecological examination. Had Reid's trial counsel been able to elicit from the prosecution's

medical expert an explicit admission on cross-examination, as did the trial counsel in

*Andrickson*, that the physical examination was not conclusive as to whether the sexual contact

was forcible intercourse or consensual sex, the Court more easily would be able to conclude that

Reid was not prejudiced by trial counsel's failure to call an expert medical witness for the

defense.

The Court is mindful, however, that it is not evaluating a stand-alone claim of ineffective

assistance of trial counsel but rather is assessing whether appellate counsel's failure to argue that

trial counsel was ineffective in failing to retain a medical expert for the defense was a

professionally unreasonable decision that prejudiced Reid's Sixth Amendment right to the

effective assistance of counsel on appeal. Appellate counsel's performance must be assessed "on

the basis of the facts of the particular case 'viewed as of the time of counsel's conduct'" without

the benefit of hindsight." *Sellan v. Kuhlman*, 261 F.3d at 315 (quoting *Mayo v. Henderson*, 13

F.3d at 533 (quoting *Strickland*, 466 U.S. at 690)). The Sixth Amendment does not require an

appellate attorney to "'forecast changes or advances in the law.'" *Id.* (quoting *Jameson v.

Coughlin*, 22 F.3d 427, 429 (2d Cir. 1994) and citing *Smith v. Murray*, 477 U.S. at 536 (holding

that challenges to appellate counsel's effectiveness are viewed in light of the law existing at the

time counsel was required to file the brief on appeal)).  Although "it is not sufficient for the

habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does

not have a duty to advance every nonfrivolous argument that could be made," *Mayo v.

Henderson*, 13 F.3d 528, 534 (2d Cir. 1994) (citation omitted), "a petitioner may establish

constitutionally inadequate performance if he shows that counsel omitted significant and obvious

issues while pursuing issues that were clearly and significantly weaker[,]" *id.* "'Generally, only

when ignored issues are clearly stronger than those presented, will the presumption of effective

assistance of counsel be overcome.'" *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.

1985)).  Thus, under *Strickland v. Washington*, "[j]udicial scrutiny of counsel's performance

must be highly deferential[,]" avoiding the temptation to "second-guess counsel's assistance after

conviction or adverse sentence[.]"  The additional layer of deference imposed on the reviewing

court by AEDPA adds to the already heavy burden faced by a defendant of establishing that

counsel was constitutionally ineffective.

 Viewing appellate counsel's representation through the two deferential filters of

*Strickland* and AEDPA, the Court concludes that it was not unreasonable for appellate counsel to

conclude, based on the case law then existing in New York, that Reid was not denied

"meaningful representation" based on the failure to call a medical expert for the defense. Reid's

trial counsel had an identifiable trial strategy which he pursued in his opening statement, in his

direct examination of petitioner and other defense witnesses, in his cross-examination of the

prosecution's witnesses, including their medical expert, and during his summation. Appellate

counsel reasonably could have concluded that while not perfect, trial counsel's pursuit of the

defense strategy was nevertheless consistent and effective. As discussed above, New York

appellate courts appear to hesitate to find ineffective assistance of trial counsel based on the

failure to call a medical expert witness for the defense, even in cases involving the sexual abuse

of a child victim. *E.g.*, *People v. Hobot*, 200 A.D.2d at 595, 606 N.Y.S.2d at 283 ("The

defendant further contends that he was denied the effective assistance of counsel because his trial

attorney failed to discover and utilize evidence in the case file regarding the results of Dr.

Acuna's examination of the complainant. While we agree with the defendant and the dissenters

that trial counsel erred in failing to familiarize himself with this material, we cannot agree that

the defendant was denied meaningful representation or was actually prejudiced thereby."), *aff'd*, 84 N.Y.2d at 1024 ("Under any view of the record in this case, trial counsel's omission did not prejudice the defense or defendant's right to a fair trial[.] . . . .Defendant has made no showing that he was denied a fair trial because trial counsel failed to utilize the medical notes prepared by the general practitioner or call her as a witness.") (internal citations omitted).

Appellate counsel arguably could have made a colorable claim regarding the failure to consult with a medical expert under the Second Circuit's January 2001 decision in *Lindstadt v. Keane*, which had been decided as of the time of his appeal. However, as discussed above, Reid's case did not involve the sexual abuse of a child and it was not a situation where trial counsel completely failed to address the medical evidence. Thus, any claim that Reid's appellate counsel might have raised under, *e.g.*, *Lindstadt v. Keane*, "was not so strong that it was unreasonable for the *coram nobis* court to conclude that appellate counsel's position was within the bounds of professional conduct under *Strickland.*" *Sellan v. Kuhlman*, 261 F.3d at 317 (applying AEDPA's deferential standard to claim of ineffective assistance of appellate counsel). Furthermore, with regard to the "prejudice" aspect of *Strickland*, the Court similarly cannot say that the *coram nobis* court's rejection of Reid's claim of ineffective assistance of appellate counsel was an objectively "unreasonable application" of that standard, which requires that a petitioner seeking to "establish prejudice in the appellate context . . . must demonstrate that 'there was a "reasonable probability" that [his] claim would have been successful before the [state's highest court].'" *Id.* at 534 (quoting *Claudio*, 982 F.2d at 803) (footnote omitted in original; alteration in original)). Accordingly, the Court concludes that this claim of ineffective assistance of appellate counsel does not provide a basis for habeas relief.

2.    **Failure to Argue that Trial Counsel Erred in Failing to Object to the Prosecution's Medical Expert Testimony**

Reid also contends that "[w]ithout objection from defense counsel, the prosecution's medical expert testified that in his opinion, the excoriation he observed when examining the complainant was 'consistent with forced intercourse.'" Pet'r Trav. at 4 (Docket No. 11). Reid further asserts that trial counsel should have objected when the physician testified that the experience she described would have been "horribly, both physically and emotionally, traumatic for her." *Id.* (Docket No. 11). *See* R.150. Reid argues that the medical expert thus was improperly permitted to testify as to "an ultimate issue in the case (whether the sexual intercourse was by means of forcible compulsion), and rendered a purely speculative opinion concerning how the complainant felt[.]" Pet'r Trav. at 5 (Docket No. 11). As noted above, appellate counsel raised these arguments under a stand-alone claim of evidentiary error on direct appeal but did not assert that trial counsel was ineffective in failing to object to the prosecution's medical expert's testimony on these grounds. Appellate counsel argued in her brief that Dr. Valenti's testimony "constituted error because he testified to an ultimate issue in the case (that is, that sexual intercourse/contact was by forcible compulsion)," and because he "rendered an opinion which was entirely speculative . . . that [the victim] would have been traumatized by what had 'happened to her[.]'" Pet'r App. Br. at 8 (Resp't Ex. B). Appellate counsel acknowledged that trial counsel had failed to object to the testimony but argued that the Appellate Division "should reverse the defendant's conviction as a matter of discretion in the interest of justice, pursuant to Criminal Procedure Law Sections 470.15(3)(c) and 470.15(6)(a)." *Id.*

As a general rule, the admissibility of expert testimony on a particular point is addressed

to the sound discretion of the trial court. *See  People v. Keindl*, 68 N.Y.2d 410, 422 (N.Y. 1986).

"Opinion testimony of an expert witness is admissible where the conclusions to be drawn

'depend upon professional or scientific knowledge or skill not within the range of ordinary

training or intelligence[.]'" *People v. Keindl*, 68 N.Y.2d at 422 (citations omitted); *see also*

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) ("The [Federal] Rules of Evidence

provide a liberal standard for the admissibility of expert testimony.").  Furthermore, as a matter

of New York State and Federal rules of evidence, there is authority for the proposition that it is

proper, in a rape prosecution, for a medical expert to offer testimony that the victim sustained

injuries that were "consistent" with the use of force. *See People v. Harris*, 249 A.D.2d 775, 672

N.Y.S.2d 153 (App. Div. 3d Dept. 1998); *People v. Rogers*, 8 A.D.3d 888, 780 N.Y.S.2d 393

(App. Div. 3d Dept. 2004) (holding that the trial court did not abuse its discretion in permitting a

"sexual assault nurse examiner" who conducted a physical examination of the victim to testify,

based on her training and experience, "that the victim's injuries were consistent with a forcible

sexual encounter and not consistent with consensual sex") (citations omitted);  *Perry v. Miller*,

No. 96 CV 5887, 1998 WL 426721, at *5 (E.D.N.Y. June 12, 1998) (rejecting claim of

evidentiary error by habeas petitioner convicted of rape; stating that it "would have been proper

to elicit from the doctor that [the victim] suffered injuries consistent with the use of force"). In

*People v. Harris*, as in Reid's case, the defendant argued that the prosecutor "should not have

been permitted to elicit an opinion from their physician witness as to whether the victim's

injuries were consistent with forcible intercourse[.]" *People v. Harris*, 249 A.D.2d at 776. The

Appellate Division rejected defendant Harris' claim, stating that it was "enough to note that [the

trial court], not injudiciously, found that this testimony provided clarification of a matter beyond

the ken of the average juror and within the scope of the expert's specialized knowledge[.]" *Id.*

(citations omitted). The Appellate Division in *Harris* further found that the medical expert's

testimony did not "impinge upon the jury's right to resolve conflicts in testimony and determine

defendant's guilt[.]" *Id.* (citation omitted).

With regard to Dr. Valenti's testimony as to how the incident would have made the

victim feel, the Court also has found authority supporting the proposition that the testimony

offered in Reid's case was not necessarily outside the bounds of what was permissible testimony

by a doctor regarding a patient's mental condition. *See Perry v. Miller*, 1998 WL 426721, at *5

(on direct examination in a rape case, the prosecution's medical expert testified that the victim

was "emotionally broken and depressed"; the habeas court stated that this was not improper

testimony regarding the victim's mental condition at the time of examination). Furthermore,

contrary to Reid's contention, the prosecution's medical expert did not testify as to whether the

injuries sustained by the victim satisfied the statutory definition of the sexual offenses with

which petitioner was charged:  It is important to note that Dr. Valenti did not testify that Bolden,

the victim, had been "raped." *Compare with People v. Perry*, 180 A.D.2d, 580 N.Y.S.2d 79

(App. Div. 2d Dept. 1992) (holding that while it was improper for a doctor to testify that the

victim had been "raped", as this constituted the ultimate question for the jury, the error was

harmless), *habeas corpus denied*, *Perry v. Miller*, 1998 WL 426721, at *5-6 ; *see also People v.*

*Keindl*, 68 N.Y.2d at 422 ("Defendant also contends that the trial court erred in admitting the

testimony of Dr. Gannon, a psychiatrist, presented to explain how children who have been

repeatedly sexually abused by their stepfather, are likely to suffer psychologically. He argues that

such expert testimony is inadmissible because it goes to the ultimate question of whether

defendant is guilty of endangering the welfare of a child which is within the province of the jury to decide and is not a subject matter beyond the ken of the ordinary juror, requiring expert testimony. We disagree."). While it is true that the medical expert in Reid's case testified that the victim's injuries were "consistent" with forcible intercourse, this opinion permitted the jury to conclude, alternatively, that although rough and forcible, it was consistent with prior consensual sex between petitioner and the victim, and was thus, on this occasion, consensual.

In this Court's view, the better practice would have been for trial counsel to object to the expert's testimony on the two points challenged here. The Court recognizes that, given the caselaw discussed above, the objection in all likelihood would have been overruled. The issue on which this Court must focus, however, is whether that error by trial counsel presented a sufficiently strong instance of constitutionally ineffective assistance on the part of trial counsel such that appellate counsel herself was professionally unreasonable in failing to raise such a claim on direct appeal.  In the rare instance, a single error on the part of a defendant's attorney can necessitate reversal of a conviction provided that it is sufficiently egregious. *See*, *e.g.*, *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (The "right to effective assistance of counsel . . . may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial."); *see also People v. Peterkin*, 27 A.D.3d 666, 667, 815 N.Y.S.2d 103 (App. Div. 2d Dept. 2006) ("'A single error may qualify as ineffective assistance, but only when the error is sufficiently egregious and prejudicial *as to compromise a defendant's right to a fair trial*[.]'" (quoting *People v. Caban*, 5 N.Y.3d 143, 152 (N.Y. 2005) (emphasis supplied)). Even then, under the New York standard, the error must be viewed in the context of the entire representation.  *Ruine v. Walsh*, 2005 WL 1705147, *19 (S.D.N.Y. July 20, 2005)

(citing *People v. Flores*, 84 N.Y.2d 184, 188 (N.Y. 1994)).

Even assuming that trial counsel's failure to object to the doctor's medical evidence testimony was error, it was not sufficiently egregious and prejudicial as to compromise Reid's right to a fair trial. Although unfavorable to Reid's case, it nevertheless was properly admissible under State and Federal evidentiary law. The Court notes that appellate counsel *did* raise the issue as a stand-alone evidentiary claim, and requested that the Appellate Division review the unpreserved claim in the interests of justice under C.P.L. §§ 470.15(3)(c), (6).  Given the extremely high standard that a defendant must meet under the constitutional standards for ineffective assistance claims based on the failure to object to allegedly prejudicial evidence, as articulated by the Supreme Court and the New York Court of Appeals, the Court cannot say that it was professionally unreasonable for appellate counsel not to include a claim of ineffective assistance of trial counsel premised on this failure to object since it was not a particularly strong claim. *See*, *e.g.*, *People v. Brown*, 266 A.D.2d 838, 838, 700 N.Y.S.2d 605, 607 (App. Div. 4th Dept. 1999) (holding that defense counsel's failure to object to erroneously admitted testimony concerning defendant's silence did not constitute ineffective assistance); *People v. Ross*, 43 A.D.3d 567, 2007 WL 2262938, *3 (App. Div. 3d Dept. Aug. 9, 2007)) ("[D]efendant argues that his trial counsel was ineffective because he failed to cross-examine any medical witnesses, failed to object to prejudicial testimony of the victim and otherwise failed to make objections and motions. Here, given defendant's claim that he had consensual sex with the victim who was then raped by Johnson, it was not ineffective to refrain from cross-examining the medical witnesses who testified to physical evidence of intercourse and DNA evidence tying both defendant and Johnson to the victim. Further, failure to object to the victim's testimony concerning Johnson and

Valentine was in keeping with this strategy. While some minor fault may be found with counsel's performance, meaningful representation does not mean perfect representation"). Since Reid has not demonstrated a reasonable probability of a different result on appeal had appellate counsel included a claim arguing that trial counsel did not render effective assistance because he failed to object to the prosecution's medical expert's testimony, *see*, *e.g.*, *People v. Ross*, 43 A.D.3d 567, 2007 WL 2262938, at *3, he has not shown that he was prejudiced by appellate counsel's representation.  The Court accordingly cannot find that the Appellate Division's rejection of Reid's claim appellate counsel was an "objectively unreasonable" application of the clearly established Supreme Court precedent articulated in *Strickland*.

### 3.      Failure to Argue that Trial Counsel Erred in Failing to Object to Prosecutorial Misconduct

Reid argues that appellate counsel rendered constitutionally deficient representation in failing to argue that trial counsel had been ineffective in failing to object to several instances of alleged prosecutorial misconduct. As noted above, appellate counsel raised the instances of prosecutorial misconduct as stand-alone claims on direct appeal, explaining to Reid that she believed that the claim was stronger than a claim of ineffective assistance of trial counsel based on the failure to object. Appellate counsel requested that the Appellate Division exercise their authority under C.P.L. § 470.15 to review the unpreserved comments as a matter of discretion and in the interests of justice. Respondent argues that appellate counsel had no basis to argue that trial counsel was ineffective in failing to object to the challenged cross-examination and remarks by the prosecutor because the remarks either were not erroneous or, if made in error, did not prejudice Reid's right to a fair trial.

The Supreme Court has held that for a defendant successfully to make out a case of prosecutorial misconduct, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the relevant inquiry is whether "the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChrisoforo*, 416 U.S. 637 (1974)). Thus, a defendant seeking reversal of his conviction premised upon alleged prosecutorial misconduct faces a heavy burden. Stated another way, to prevail on a claim of prosecutorial misconduct in both Federal and New York State, the petitioner must demonstrate that the prosecutor's improper remarks caused him "substantial prejudice." *United States v. Bautista*, 23 F.3d 726, 732 (2d Cir.1994); *People v. McCombs*, 18 A.D.3d 888, 890, 795 N.Y.S.2d (App. Div. 3d Dept. 2005) "Reversal of a conviction for prosecutorial misconduct is warranted only where a defendant has suffered substantial prejudice such that he was deprived of due process of law[.]") (citations omitted); *People v. Patterson*, 88 A.D.2d 694, 451 N.Y.S.2d 321 (App. Div. 3d Dept. 1982) (citing *People v. Brosnan* 32 N.Y.2d 254, 262 (N.Y. 1973)). "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *United States v. Young*, 470 U.S. 1, 11-12 (1985), *accord*, *e.g.*, *People v. Galloway*, 54 N.Y.2d 396 (N.Y. 1981) (agreeing that reversal of a conviction "'is properly shunned when the [prosecutorial] misconduct has not substantially prejudiced a defendant's trial'") (quoting *United States v. Modica*).

Reid first contends that appellate counsel erred in failing to argue that trial counsel was constitutionally ineffective in failing to object when the prosecutor opened his cross-examination of Reid by improperly commenting on a defendant's ability to hear all of the other witnesses

testify prior to his taking the stand. Reid argues that the prosecutor suggested in his questioning

of Reid that Reid had an opportunity to tailor his testimony because he had sat in the courtroom

through the instant trial and prior proceeding, had listened to all the witnesses testify, and had

"five months" to "think about that [*i.e.*, the other witnesses' testimony]." R.347. Reid also

assigns error to the prosecutor's statement on summation that petitioner was the "only witness

that sat through the entire trial and listened to every other witness's testimony. Every other

witness that testified had to be outside the courtroom and he is an interested witness. He is

affected very greatly by the outcome of this case." R.398.

In *Portuondo v. Agard*, which had been decided before Reid's appeal was perfected, the

Supreme Court was asked to rule on the propriety of "commenting on a testifying defendant's

unique ability to hear prior testimony." 529 U.S. 61, 67 (2000). It is arguable that the prosecutor

in *Agard v. Portuondo*, in contrast to Reid's case, overtly accused the petitioner of fabricating his

testimony.[4] The Supreme Court held in *Agard*, however, that such remarks did not deprive the

petitioner of his right to a fair trial, and reiterated the long-established principle that "when a

defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that

of any other witness.'" *Agard*, 529 U.S. at 69 (quoting *Brown v. United States*, 356 U.S. 148, 154

(1958)). "'[W]hen [a defendant] assumes the role of a witness, the rules that generally apply to

---

[4]        In *Portuondo v. Agard*, the prosecutor's commented during summation as follows:

"You know, ladies and gentlemen, unlike all the other witnesses in this case the defendant has a
benefit and the benefit that he has, unlike all the other witnesses, is he gets to sit here and listen to
the testimony of all the other witnesses before he testifies.
. . . . .

"That gives you a big advantage, doesn't it. You get to sit here and think what am I going to say
and how am I going to say it? How am I going to fit it into the evidence?
. . . . .
"He's a smart man. I never said he was stupid . . . . He used everything to his advantage."

other witnesses– rules that serve the truth-seeking function of the trial-are generally applicable to him as well.'" *Id.* (quoting *Perry v. Leeke*, 488 U.S. 272, 282 (1989) and citing *Reagan v. United States*, 157 U.S. 301, 305 (1895)). The Supreme Court noted that it was "natural and irresistible for a jury, in evaluating the relative credibility of a defendant who testifies last, to have in mind and weigh in the balance the fact that he heard the testimony of all those who preceded him." *Id.* The Supreme Court held that the prosecutor's comments on summation neither burdened the defendant's Fifth and Sixth Amendment rights present at trial, to be confronted with witnesses, or to testify on his own behalf, nor violated respondent's Fourteenth Amendment right to due process. *Id.* Furthermore, the Supreme Court explicitly rejected the notion that such comments during summation regarding the defendant's presence at trial and on the ability to fabricate that his presence afforded him did not deprive him of due process, even though under New York state statute, a defendant is required to be present at trial. *Id.*

The second alleged instance of prosecutorial misconduct to which Reid claims that trial counsel should have objected occurred when the prosecutor asked him to state whether the testimony of a defense witness, Edwards, was true, or whether she had "made it up out of the clear blue sky." R.367. Reid contends that the prosecutor thereby compelled him to "characterize another witness as a liar." Pet'r Trav. at 8 (Docket No. 11). The point of testimony in issue concerned whether Reid actually had proposed marriage to the victim, Bolden.  As noted above, Edwards had testified for the defense about the victim's angry reaction to news that Reid was engaged to Bell.

Here, by embellishing his question by asking if the witness had "made up" the testimony "out of the clear blue sky," the prosecutor's query likely would have been interpreted by the

reasonable juror as obliging petitioner to characterize Edwards, a defense witness, as a "liar." In this Court's opinion, this went beyond simply asking the witness whether her testimony was "true." *Cf. People v. Thompson*, 220 A.D.2d 239, 631 N.Y.S.2d 852 (App. Div. 1st Dept. 1995) ("As for prosecutorial misconduct, at no time was defendant asked to characterize the People's witnesses as "liars" or as "lying", but simply whether any testimony contrary to his own was not "true[.]"). In any event, although attempts by a prosecutor to compel a defendant to state that witnesses as "liars" or are "lying" have been condemned as a matter of New York state law, such improper conduct does not necessarily deprive the defendant of a fair trial. *E.g.*, *People v. Overlee*, 236 A.D.2d 133, 138, 666 N.Y.S.2d 572, 576 (App. Div. 1st Dept. 1997) ("While this Court has cautioned prosecutors to avoid goading a testifying defendant into characterizing the People's witnesses as liars, especially when the defendant, by his testimony, has not impugned the truthfulness of those witnesses, such conduct does not always require reversal[.]") (citations omitted) *People v. Chaney*, 155 A.D.2d 985, 986, 548 N.Y.S.2d 129, 130 (App. Div. 4th Dept. 1989) ("Although the prosecutor acted overzealously, impermissibly bolstering and vouching for his own witnesses and in one instance calling defendant a liar, we cannot say under all the circumstances that defendant was deprived of a fair trial[.]") (citations omitted).  Furthermore, Edwards was not a significant prosecution witness; she was a defense witness, and the point about which she and Reid apparently disagreed–whether Reid had proposed and given the victim an engagement ring–was of minor importance. *See United States v. Gaind*, 31 F.3d 73 (2d Cir. 1994). Finally, although the Court does not find that the prosecutor used the words "liar" or "lying" in Reid's case, it bears noting that such a practice is not necessarily erroneous as matter of Federal law.  For instance, in *United States v. Peterson*, 808 F.2d 969, 977 (2d Cir.1996), *cert.*

*denied*, 520 U.S. 1132 (1997), the Second Circuit held in a direct appeal case that it was

permissible for the prosecutor to use "liar" when characterizing disputed testimony when the

witness' credibility was clearly an issue, unless its use was "excessive or . . . likely to be

inflammatory" )). *See also Strouse v. Leonardo*, 928 F.2d 548, 556-57 (2d Cir.1991) (repeatedly

referring to defendant as "liar" improper but not denial of fair trial); *United States v. Sanchez*

*Solis*, 882 F.2d 693, 697 (2d Cir.1989) (noting that it has "approved the limited,

non-inflammatory use by a prosecutor of terms such as 'lies' to describe testimony that is

challenged as untruthful" ; prosecutor's summation statements that defendant had lied on witness

stand "were not inflammatory" and did not require reversal of conviction on direct appeal);

*United States v. Resto*, 824 F.2d 210, 212 (2d Cir.1987) (direct appeal; prosecutor's summation

statement that defendant's testimony consisted of, *inter alia*, "flat out-and-out lies" deemed

"neither excessive nor inflammatory" ). Thus, on balance, the Court concludes that, while the

prosecutor's question of petitioner concerning Edwards' testimony regarding the engagement

was ill-advised and improper, appellate counsel's failure to argue that trial counsel had been

ineffective in failing to object to this prosecutorial misconduct did not render the representation

constitutionally deficient.

Third, Reid faults trial counsel for failing to object when the prosecutor allegedly

vouched for the credibility of the victim by commenting that she was "a good mother with no

reason to lie," R.403. The prosecutor commented that "everything she says is backed up by other

witnesses in this court sworn under oath." R.404. Reid also asserts that the prosecutor erred in

commenting that if the victim "wanted to frame him, she could do a lot better job . . . ." and

asking, rhetorically, "why would [the victim] make this up? . . . Why would she go through

this?"  Here, a major aspect trial counsel's strategy *was* to show that the victim was not credible

and that she was a "scorned woman" who had fabricated the rape charges in an attempt to

retaliate against Reid for getting engaged to another woman. Where the defense has attacked the

credibility of the prosecution witnesses in summation, appellate courts in New York have

rejected similar assertions that a prosecutor improperly vouches for the victim's credibility by

stating that she or he had no motive to lie.  *E.g.*, *People v. Barber*, 13 A.D.3d 898, 900 (App.

Div. 3d Dept. 2004) (citing, *inter alia*, *People v. Ruiz*, 8 A.D.3d 831, 832 (App. Div. 3d Dept.),

*lv. denied* 3 N.Y.3d 711 (N.Y. 2004); *People v. Overlee*, 236 A.D.2d 133, 144 (App. Div. 1st

Dept. 1997), *lv. denied* 91 N.Y.2d 976 (N.Y. 1998); *People v. Sims*, 162 A.D.2d 384, 385, 557

N.Y.S.2d 40, 41 (App. Div. 1st Dept. 1990) (Prosecutor's closing argument that his witnesses had

no reason to lie was proper in response to defendant's summation stating that testimony was not

honest and that witness and the police were trying to frame him)). Likewise, New York appellate

courts have held that a prosecutor's statement in summation that the evidence did not contradict

the prosecution witnesses' testimony was a permissible response to the defense theory that the

victim and had fabricated the charges and did constitute burden-shifting. *People v. Barber*, 13

A.D.3d at 900 (citing *People v. Townsley*, 240 A.D.2d 955, 958-959 (App. Div. 3d Dept.), *lv.*

*denied* 90 N.Y.2d 943 (N.Y. 1997)).

Similarly, as a matter of Federal law, although it is generally true that the government

may not vouch for the credibility of its own witnesses, the Second Circuit has noted that a

prosecutor may respond to a defense summation that "invited this response." *Gonzalez v.*

*Sullivan*, 934 F.2d at 424 (2d Cir. 1991) ("[T]o the extent that [the prosecutor] argued that [key

prosecution witness] Malavet had no reason to lie, the defense's summation invited this response

-42-

by arguing that Malavet had testified only to impress the other key prosecution witness. In this

context, the prosecutor's response is unlikely to have affected the jury's ability to judge the

evidence fairly.") (citing *United States v. Young*, 470 U.S. at 12-13); *accord Everett v. Fischer*,

No. 00-CV-6300 (NG), 2002 WL 1447487, at *3 (E.D.N.Y. July 3, 2002) (prosecutor's

comments as to the credibility of government witnesses a "fair response" to defense counsel's

attack on the credibility of those witnesses); *Shariff v. Artuz*, No. 97CIV.2882 (RCC JCF), 2001

WL 135763, at *8 (S.D.N.Y. Feb. 16, 2001) ("Although the government may not vouch for a

witness's credibility, it may respond to an argument that impugns the government's integrity or

the integrity of the case.") (adopting Report & Recommendation); *Ramos v. Keane*, No. 92 Civ.

9111 (LBS), 1994 WL 97080, at *4 (S.D.N.Y. Mar. 23, 1994) ("[A] prosecutor may present what

. . . amounts to a boisterous argument if it is specifically done in rebuttal to assertions made by

defense counsel in order to remove any stigma cast upon the government or its witnesses.")

(internal quotation marks and citation omitted); *Murcer v. Williams*, No. 92 Civ. 0319(MEL),

1992 WL 176940, at *4 (S.D.N.Y July 10, 1992) (holding that prosecutor's statement that the

state's witnesses, the police officers who had arrested petitioner in the course of a narcotics task

force "buy operation", had no motive to falsify their testimony was not a constitutional violation)

(citing *Harper v. Kelly*, 704 F. Supp. 375 (S.D.N.Y. 1984) (prosecutor's contention that two state

witnesses were not the kind of people who would accuse someone of robbery "for the heck of it"

and neither had a motive to lie, was not a constitutional violation), *rev'd. on other grounds*, 916

F.2d 54 (2d Cir.1990), *cert. denied*, 111 S. Ct. 1403 (1991).

Finally, Reid claims that the prosecutor on two occasions "expressed his personal opinion

on the evidence," Pet'r Trav. at 9 (Docket No. 11), and also "state[d] his personal opinion of the

credibility of the witnesses he calls to testify[,]" *id.* (citations omitted). Reid asserts that trial

counsel was ineffective in failing to object and, in turn, that appellate counsel erred in failing to

assert an ineffective assistance of trial counsel claim premised on the failure to object.

As Reid points out, it is improper for a prosecutor to vouch for the credibility of his own

witness or express his personal opinion concerning the merits of particular evidence, both as a

matter of New York State and Federal law. *E.g.*, *United States v. Eltayib*, 88 F.3d 157, 173 (2d

Cir. 1996) ("[A] prosecutor 'may not properly vouch for the credibility of a witness.'") (quoting

*United States v. Thai*, 29 F.3d 785, 807 (2d Cir.), *cert. denied*, 513 U.S. 977 (1994)); *see also*

*id.* ("It is strictly 'improper for a prosecutor to interject personal beliefs into a summation,' and

we have therefore stressed that 'it is a poor practice . . . for prosecutors to frequently use

rhetorical statements punctuated with excessive use of the personal pronoun "I."'") (quoting

*United States v. Nersesian*, 824 F.2d at 1328)); *People v. Bailey*, 58 N.Y.2d 272, 277 (N.Y.

1983) ("[A] prosecutor may not, either in the course of closing argument or even in a less

argumentative trial context, 'express his or her personal belief or opinion as to the truth or falsity

of any testimony or evidence[.]'") (quoting A.B.A. Project on Standards for Criminal

Justice, Prosecution and Defense Function, Standard 3-5.8[b] and citing Annotation, 50

A.L.R.2d 766)). As the Second Circuit has explained, "[t]he problem with a prosecutor's use of

the pronoun 'I' is that it 'tends to make an issue of [the prosecutor's] own credibility, or to imply

the existence of extraneous proof.'" *Eltayib*, 88 F.3d at 172 (quoting *United States v. Rivera*, 22

F.3d 430, 438 (2d Cir. 1994) (quotations, alterations and citations omitted in original)). However,

"a prosecutor's use of the pronoun 'I' does not automatically wreck the case." *Id.*; *see also*, *e.g.*,

*People v. Franklin*, 288 A.D.2d 751, 755 (App. Div. 3d Dept. 2001) ("Defendant contends that

the prosecutor's repeated use of the pronoun 'I' constituted an impermissible expression of

personal belief or opinion as to defendant's guilt. Such usage was merely stylistic and did not, in

our view, constitute an impermissible expression of belief or opinion."); *People v. Lamont*, 21

A.D.3d 1129, 1131 (App. Div. 3d Dept. 2005) (same).

The Court now turns to the challenged instances of the prosecutor's use of the personal

pronoun during his summation at Reid's trial. Reid contends that appellate counsel was

ineffective in declining to argue trial counsel's ineffectiveness in failing to register a timely

objection to the following remarks:  "Does [the victim] sound like a woman who would let

[petitioner] come over a couple times a month to see his son and have a little sex completely not

committed [sic], while engaged to Jodie Bell? I don't think so." R.403. This apparently was in

response to petitioner's testimony on direct examination that he and the victim continued to have

sexual intercourse even during the times when they were not officially dating, and that when they

would break up, their reunions would always involve sex. The prosecutor also commented, "We

have sperm found 30 hours after the time that both parties agree [sexual intercourse] took place.

In [the victim's] underwear, in vaginal specimens and the smears from her, that were found on

her leg. Did she know that it would last 30 hours? I doubt it." R.404. This comment was intended

to rebut the defense argument that the victim, after realizing that petitioner "[w]as leaving her for

real for the first time," R.394, had become so upset and vindictive that she made accusations of

rape against him.

Without a doubt, the prosecutor was entitled to respond to the defense's summation and

to ask the jury "to consider drawing argued inferences and conclusions" based on the evidence

presented.  *See Eltayib*, 88 F.3d at 173 ("We have 'found acceptable the prosecutor's use of the

phrase "I submit to you that," in light of the defense counsel's accusations during its summation that the testimony of the government's informant was fabricated.") (quoting *Rivera*, 22 F.3d at 438) (explaining that "the government is allowed to respond to argument that impugns its integrity or the integrity of its case"). However, the prosecutor at Reid's trial was obliged "to avoid giving the impression that [he] [was] conveying [his] personal views to the jurors[,]" *Nersesian*, *supra*, which his use of the phrases "I don't think so" and "I doubt it" tended to do.

Nevertheless, the Court cannot conclude either that these two remarks were so egregious as to warrant reversal as a matter of State or Federal law, or that appellate counsel erred in deciding not to argue that trial counsel had been professionally unreasonable in failing to object to them. To be contrasted with Reid's case is *People v. Bailey*, in which the prosecutor's use of "I submit" prefaced an accusation that a key witness for the defense was lying. After that witness gave testimony "related to the overriding issue of [defendant Bailey's] identification," the prosecutor said to her, "'I submit to you, ma'am, your [sic] telling a bald face lie right now.'" *People v. Bailey*, 58 N.Y.2d 272, 274, 460 N.Y.S.2d 912, 912 (N.Y. 1983). Undeterred, the prosecutor in *People v. Bailey* then "in effect [made himself] . . . an unsworn witness to [the witness'] truthfulness," stating on the record, "'I'll sit in the stand and testify to that, [defense counsel]. No further questions.'" *Id.* at 274. The New York Court of Appeals, finding this instance of prosecutorial vouching to be egregious in defendant Bailey's extremely close case, reversed the conviction.

The challenged remarks in Reid's case present a scenario more similar in phraseology to that in *United States v. Nersesian*, in which the prosecutor employed phrases such as "I think it is clear," or "Does it makes sense–I think it does," which Second Circuit found to be unacceptable

but not a basis for reversal.  Reid's case is, in this Court's opinion, not even close to what

occurred in *Nersesian*. For example, in contrast to the two instances of an improper use of "I"

that Reid identifies, the defendant in *Nersesian*

> identified at least 65 instances in which remarks by the prosecutor were replete
> with the use of the personal pronoun "I" or with assertions that a witness was
> "correct" or "right." At other times the prosecutor introduced a sentence with
> phrases such as " I think it is clear," " I am going to suggest to you," or " I believe
> on the basis of what you've heard" (emphasis added). On other occasions, the
> prosecutor answered rhetorical questions such as "was [the witness] correct?"
> with phrases such as "the answer is yes," or simply, "yes."

*Nersesian*, 824 F.2d at 1327. The Second Circuit stated while not "acceptable," such phrases

employing "I" do "not merit reversal unless "the summation viewed as a whole . . . reflect[s]

improper vouching." *Id.*; *accord Eltayib*, 88 F.3d at 173. As was the case at Reid's trial, the

defendant's counsel in *Nersesian* did not object contemporaneously to the challenged comments.

The Second Circuit found that reversal was not warranted, noting that the prosecutor's

misconduct was limited to a small part of a lengthy summation and that the trial court instructed

the jury that the lawyers' statements were not evidence.  *Id.*[5]

The prosecutor in Reid's case, in contrast to the prosecutor in *People v. Bailey*, did not

---

[5]         As a further point of comparison, there is the phrase "I submit that . . ."   In *Eltayib*, the Second
Circuit held that the prosecutor's use of "I submit that" on "numerous occasions . . . was not improper" because
defense counsel "specifically attacked [the witness'] credibility and veracity in their summations" and thereby
"impugn[ed] the integrity of [the government's] case" and "entitled [the prosecutor] to respond with
counter-arguments." In addition, the prosecutor's statements that followed the "I submit that" phrase either relied on
evidence in the case to corroborate the witness' testimony, or  asked the jurors to draw inferences based on their
common sense that would lead to the conclusion that the witness had no motive to lie to the government." The
Second Circuit concluded that "[n]either type of statement injected the prosecutor's personal beliefs or opinions into
his argument, or suggested that unrevealed information in the government's investigative files established the
witness' veracity."  Finally, the Second Circuit explained, the "phrase 'I submit' expresse[d] not a personal belief but
a contention, an argument, which, after all, is what a summation to the jury is meant to be." Although the
"well-advised prosecutor will sidestep all uses of the pronoun 'I,' . . . the phrase 'I submit' is not improper in these
circumstances." *See id.* (statement preceded by "I submit to you that" not impermissible).

effectively make himself an "unsworn witness." Nor did he make outright assertions that a witness was "correct" or "right," as did the prosecutor in *United States v. Nersesian*.   While defense counsel, to a certain extent, had invited the attack on the victim's credibility given the defense theory of the case and his arguments on summation, nonetheless, the Court cannot endorse the prosecutor's use of the personal pronoun "I don't think so" and "I doubt it" when he asked the jury rhetorically if the inferences that defense counsel was asking to be drawn from the evidence made sense. Although there were only two improper instances of the use of "I", and the prosecutor's phrasing of the challenged statements was more equivocal than an outright endorsement, they nonetheless were not "acceptable," *see Nersesian*, 824 F.2d at 1327. However, the Court does not believe that they merit reversal because "the summation viewed as a whole [did not] . . . reflect improper vouching." *Id.*

The Court now turns to Reid's asserted ground for habeas relief–that appellate counsel was ineffective in failing to argue that trial counsel did not render effective assistance based on his failure to object to the allegedly improper remarks and lines of questioning discussed in the preceding paragraphs. As mentioned above, appellate counsel did raise prosecutorial misconduct as a stand-alone claim in her appellate brief; she included the unobjected-to comments as well as one additional comment to which trial counsel did register an objection. Appellate counsel submitted a well-written, persuasive argument, citing to authority supporting the review of unpreserved claims of prosecutorial misconduct and reversal thereon. *See* Pet'r App. Br., Resp't Ex. B. In response to Reid's letter inquiring as to why she did not raise an ineffective assistance of trial claim premised on the failure to preserve the claims of prosecutorial misconduct, appellate counsel explained that she "could not argue that [trial counsel's] errors constituted

ineffective assistance of counsel" because he "actively cross-examined witnesses for the prosecution, offered evidence on [petitioner's] behalf and made legal arguments by casting the proof in the light most favorable to [petitioner]." *See* Letter from Appellate Counsel to Petitioner dated February 25, 2001, Resp't Ex. D. Appellate counsel noted that under the Constitution, defendants are were "not entitled to a perfect, error-free trial" and that defense counsel's representation "did not appear . . . to be so poor as to meet the standard necessary to establish ineffective assistance of counsel." *Id.*  Appellate counsel's letter be read as conceding that trial counsel erred in not objecting to the instances of prosecutorial misconduct; generally speaking, the better practice is to object to improper comments on summation, both to preserve the claims for review and to provide the trial court an opportunity to issue curative instructions if the objection is sustained. There may be times, however, when, for strategic reasons, trial counsel does not object to comments by the prosecutor so as not to draw the jury's attention to them. *See Gatto v. Hoke*, 809 F. Supp. 1030, 1039 (E.D.N.Y. 1992) ("Moreover, counsel's failure to object to the prosecutor's summation represents his tactical decision to avoid underscoring the prosecutor's statements so as to draw the jury's attention to them.") (citing *United States v. Grunberger*, 431 F.2d 1062, 1068-69 (2d Cir. 1970) ("[I]t is understandable that a defense counsel may wish to avoid underscoring a prejudicial remark in the minds of the jury by drawing attention to it.").

Even assuming that it was error, and not a matter of trial strategy, for trial counsel not to have objected to all of the instances of prosecutorial misconduct asserted by Reid here, appellate counsel was not professionally unreasonable in declining to include such a claim on direct appeal. Although the New York Court of Appeals has interpreted the State constitutional test for

ineffective assistance to be more "flexible" than the Federal standard articulated by the Supreme

Court in *Strickland*, *see People v. Caban*, 5 N.Y.3d at 154-55, it nevertheless presents an

extremely high hurdle for a defendant to scale. *See People v. Stultz*, 2 N.Y.3d 277, 287 (N.Y.

2004) ("[I]n making appellate arguments, attorneys must evaluate the performance of trial

counsel and, when appropriate, raise claims of ineffective representation. Although it involves a

kind of Monday morning quarterbacking, there are instances–unusual, to be sure, but on occasion

merited–when trial counsel's representation is derelict. The case before us involves a second

layer of review, in which the Tuesday morning quarterback assails the Monday morning

quarterback for not assailing the quarterback who actually played the game. While there may be

instances in which a claim of this type will justify relief, this is not one of them.").  "An attorney

who presents a well-grounded but unsuccessful defense will not later be held to have provided

ineffective assistance of counsel, and thus a defendant will not be entitled to a vacatur of his

conviction on such basis." *People v. Baldi*, 54 N.Y.2d at 140; *accord, e.g., Strickland v.

Washington*, 466 U.S. at 689. New York's standard for judging ineffective assistance of counsel

claims is one of "meaningful representation," *People v. Baldi*, 54 N.Y.2d at 146, with the "most

critical concern" being to "avoid both confusing true ineffectiveness with mere losing tactics and

according undue significance to retrospective analysis," *id.*  The New York Court of Appeals

consistently has stated that "[s]o long as the evidence, the law, and the circumstances of a

particular case, viewed in totality and as of the time of the representation, reveal that the attorney

provided meaningful representation, the constitutional requirement will have been met[.]" *Id.*;

*accord, e.g., People v. Stultz*, 2 N.Y.2d at 284. "Stated another way, a court must examine

whether counsel's acts or omissions 'prejudice[d] the defense or defendant's right to a fair trial.'"

*People v. Benevento*, 91 N.Y.2d 708, 714 (N.Y. 1998) (quoting *People v Hobot*, 84 N.Y.2d at

1024 and citing *People v Bennett*, 29 NY2d 462, 464 (question is whether "the representation of

a defendant by his assigned lawyer was so inadequate and ineffective as to deprive him of a fair

trial'); *People v Aiken*, 45 NY2d 394, 401 (stating that the "basic issue" is "whether a defendant's

counsel, appointed or retained, failed to provide effective legal representation, thereby depriving

the defendant of a fair trial")).

      The Court cannot say that given the record before appellate counsel, and looking at

defense counsel's representation in the context of the whole trial, the decision not to raise a claim

of ineffective assistance of trial counsel on appeal fell "outside the wide range of professionally

competent assistance." *Strickland*, 466 U.S. at 690.  Here, the defense strategy remained clear

from counsel's opening remarks through his summation, and trial counsel supported the strategy

by introducing evidence on petitioner's behalf and effectively cross-examining the prosecution's

witnesses. The Court recognizes that neither trial counsel–nor the prosecutor for that

matter–performed without making some errors at Reid's trial. However, appellate counsel was

not unreasonable determining that, notwithstanding the claimed deficiencies in counsel's

performance, Reid still received meaningful representation. Furthermore, the Court has not

found, and Reid has not come forward with, any supporting authority  that a State or Federal

constitutional right to effective assistance of counsel claim, based on factual circumstances

sufficiently similar to those presented by his case, had a "reasonable probability" of succeeding

on direct appeal. To the contrary, it appears to be more difficult to succeed on a claim of

ineffective assistance of trial counsel based on the failure to object to prosecutorial misconduct

than on a claim based on unpreserved prosecutorial misconduct. *Compare*, *e.g.*, *People v. Adams*,

252 A.D.2d 980, 980, 676 N.Y.S.2d 361, 362 (App. Div. 4th Dept. 1998); *People v. Priester*, 102

A.D.2d 942, 477 N.Y.S.2d 803 (App. Div. 2d Dept. 1984); *People v. Marshall*, 2 A.D.3d 1157,

1158, 768 N.Y.S.2d 703, 704, 2003 N.Y. Slip Op. 19833 (App. Div. 3d Dept. 2003) *with*

*e.g.*, *People v. Santiago*, 78 A.D.2d 666, 666, 432 N.Y.S.2d 216, 217 (App. Div. 2d Dept. 1980);

*People v. Roundtree*, 190 A.D.2d 879, 880, 593 N.Y.S.2d 345, 346 (App. Div. 3d Dept. 1993).

Thus, the Court is not convinced that Reid has demonstrated that he was prejudiced by appellate

counsel's failure to raise an ineffective assistance of trial counsel claim on direct appeal based on

trial counsel's failure to object to instances of alleged prosecutorial misconduct.

**4.     Failure to Advise Petitioner of Ability to Raise Claims in *Pro Se*
Supplemental Brief**

Finally, Reid contends that after appellate counsel declined to add his claim of ineffective

assistance of trial counsel to her appellate brief submitted on his behalf, appellate counsel failed

to advise him that he could seek to the raise the issue in a *pro se* supplemental brief. As

respondent points out, a "defendant had no right, constitutional or otherwise, to file a

supplemental pro se brief on appeal when represented by counsel who argued nonfrivolous issues

on his behalf. *People v. White*, 73 N.Y.2d 468, 479 (N.Y.), *cert. denied*, 493 U.S. 859 (1989);

*accord*, *e.g.*, *Glen v. Senkowski*, No. 02-CV-3167(JBW), 03-MISC-0066(JBW), 2003 WL

22952857, at *11 (E.D.N.Y. Oct. 9, 2003)). However, the New York Court of Appeals has held

that counsel who adopts and submits nonfrivolous appellate issues on behalf of the defendant but

refuses to raise other issues requested, should explain to the client why the other issues should

not be submitted and advise the client that, if he or she wishes, permission may be sought to file

a supplemental brief with the appellate court. *Id.* (citing *People v Vasquez*, 70 N.Y.2d 1 (N.Y.

1987)). The court in *White* explained that *Vasquez* "addressed the ethical obligation counsel owes

a client [and] . . . did not create any right on behalf of indigent defendants to act as cocounsel on

appeal when represented by counsel presenting nonfrivolous issues."  The New York Court of

Appeals noted that "it is the prerogative of counsel, not the client, to decide what issues should

be raised on appeal." Thus, the procedure articulated in *People v. Vasquez* "is, at best, a guide to

determining what is reasonable; it is not a dispositive rule, the violation of which automatically

results in ineffective assistance of counsel." *Lovacco v. Kelly*, No. 99 CIV. 3094 GBDFM, 2002

WL 31045942, at *10 (S.D.N.Y. June 13, 2002) (rejecting habeas petitioner's claim that

appellate counsel was ineffective in failing to follow *People v. Vasquez* regarding claims which

appellate counsel declined to raise in his brief on direct appeal) (citing *Strickland*, 466 U.S. at

689) (holding that a "set of rules [for counsel's conduct] would interfere with the constitutionally

protected independence of counsel and restrict the wide latitude counsel must have in making

tactical decisions" ); *Glen v. Senkowski*, 2003 WL 22952857, at *11 ("The cases in New York

which have laid out a procedure of filing a *pro se* supplemental brief, to be followed when a

defendant wishes to raise an appellate issue which his attorney believes does not have merit, did

not create any right on behalf of any defendant to act as co-counsel on appeal when represented

by counsel who present nonfrivolous issues.").

Here, the Court agrees that it would have been better practice for appellate counsel to

have informed Reid that he could apply for permission to file a *pro se* supplemental brief with

the Appellate Division. However, the failure to so advise Reid, without more, did not violate any

State or Federal constitutional right to counsel. *Cf. People v. Vasquez*, 70 N.Y.2d at 4 (finding

that although appellate counsel was "not obliged to discuss the nine allegedly meritless claims

his client wanted addressed . . . he should not have identified them [in the appellate brief] and then disparaged them before the court" by stating in the brief, "These points (issues), which appellate counsel has reviewed and found to be lacking in merit, as submitted by the defendant-appellant to his counsel, are as follows:" . . . By doing so, counsel affirmatively undermined arguments his client wished the court to review and, for all practical purposes, precluded his client from presenting them effectively in a *pro se* brief"). Thus, this Court cannot find that the Appellate Division, in denying Reid's *coram nobis* application and rejecting his claim that appellate counsel was ineffective, unreasonably applied the clearly established Federal law, articulated in *Strickland*, 466 U.S. at 688-98, for assessing such claims.

## IV.      Conclusion

          For the foregoing reasons, Reid's request for a writ of habeas corpus is denied and the petition is dismissed. The Court also finds that no certificate of appealability should issue inasmuch as Reid has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2) (providing, in relevant part, that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Miller-El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 1039-1042 (2003) ("Under the controlling standard, a petitioner must show that reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.") (citation and internal quotation marks omitted).

          **IT IS SO ORDERED.**                    /s/ *Victor E. Bianchini*

                                         _____
                                              VICTOR E. BIANCHINI
                                              United States Magistrate Judge

DATED:       October 31, 2007
                  Rochester, New York.